COMMONWEALTH *VS.* DEBORAH O'NEIL & another.[1]

No. 99-P-592.

Essex. October 5, 2000. - March 16, 2001.

Present: LAURENCE, DREBEN, & GELINAS, JJ.

*Burning a Dwelling House. Joint Enterprise. Practice, Criminal,* Assistance of counsel. *Constitutional Law,* Assistance of counsel. *Due Process of Law,* Assistance of counsel. *Evidence,* Bias of government witness, Exculpatory. *Witness,* Bias.

With respect to one of two defendants indicted and convicted as joint venturers in an arson, evidence presented to the grand jury was sufficient to establish probable cause that the defendant committed the crime. [171-172]

At the trial of an arson indictment, defense counsel provided ineffective assistance by failing to challenge the credibility of the main Commonwealth witness, a coventurer in the arson, with written evidence of a promise, reward, or inducement for the witness's testimony, and the prosecutor's apparent misconduct in misrepresenting the writing setting forth the implicit agreement only compounded counsel's missteps; a new trial was required where the impeachment of the witness might have accomplished something material for the defense and would likely have made a difference in the result. [178-183]

INDICTMENTS found and returned in the Superior Court Department on August 20, 1997.

A motion to dismiss one indictment was heard by *Joseph A. Grasso, Jr.,* J., and the cases were tried before *Martha B. Sosman,* J.

*Douglas J. Beaton* for Steven O'Neil.

*Larry J. Colby* for Deborah O'Neil.

*Elin H. Graydon,* Assistant District Attorney, for the Commonwealth.

LAURENCE, J. Deborah O'Neil and her son, Steven O'Neil, were indicted and convicted as joint venturers in the arson of a

_____
[1]Steven O'Neil.

Lawrence residence. The arson was actually committed by another son, Michael O'Neil, and his best friend, Charles Rosinski. Steven O'Neil here challenges the denial of his pretrial motion to dismiss the indictment against him, asserting that the grand jury heard insufficient evidence to establish probable cause to arrest him for the crime charged. Deborah O'Neil contends primarily that her counsel was ineffective in cross-examining Rosinski, the Commonwealth's only percipient witness against her. She also accuses the prosecutor of knowingly presenting false evidence through Rosinski and of failing to disclose, until midtrial, inculpatory statements attributed to her by another witness, Steven Windle; she attacks the trial judge's admission of those statements over her objection; and she argues that the cumulative effect of the assigned errors denied her a fair trial. We affirm Steven's conviction but reverse Deborah's. Her receipt of prejudicially ineffective assistance of counsel is manifest on the record before us.

The arson was the irrational culmination of an effort to exact vengeance for the beating of Michael O'Neil by one Joe Spinney. According to the Commonwealth's evidence, two days after the beating, Michael, Rosinski, Steven, and several others (including Deborah, according to Rosinski's testimony) inflamed by alcohol and drugs, drove to a triple-decker apartment building occupied in part by Spinney's family. Members of the group first issued physical challenges to the occupants, then threw stones at the windows. When no one emerged, unspecified members of the group proceeded to obtain a milk jug full of gasoline, which Michael and Rosinski used to set fire to the building's porch and stairs. Everyone involved then fled. Less than two months later, Michael and Rosinski were indicted for the arson as youthful offenders. The same grand jury also indicted Steven and Deborah.

1. *As to Steven.* The Commonwealth had the burden to present to the grand jury evidence sufficient to establish probable cause that Steven (1) was present at the scene of the crime, (2) with intent to commit a crime or with knowledge that another intended to commit a crime, and (3) by express or implicit agreement was willing and available to assist that other in effecting his criminal purpose. *Commonwealth* v. *Bianco*, 388

Mass. 358, 366 (1983). *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988). The required mental state that the prosecution had to show Steven possessed was a wilful and malicious intent. G. L. c. 266, § 1. *Commonwealth* v. *Mandile*, 403 Mass. 93, 100 (1988). *Commonwealth* v. *Stewart*, 30 Mass. App. Ct. 569, 573, *S.C.*, 411 Mass. 345 (1991). Such intent is rarely shown by direct evidence, but can be drawn from reasonable and possible inferences deduced from the circumstances. *Longo, supra* at 487.

Steven argues that the evidence before the grand jury revealed his mere presence in the car seen leaving the scene of the arson. We agree with the trial judge's finding, however, that the grand jury heard sufficient evidence from witnesses Rosinski and Windle regarding Steven's enthusiastic participation in all phases of the criminal enterprise to sustain a probable cause showing that he had the necessary knowledge and intent to commit or assist in the arson under a joint venture theory.[2] Steven's reiterated reliance on *Commonwealth* v. *McCarthy*, 385 Mass. 160 (1982), does him no good, because in that case, unlike this one, there was *no* evidence of participatory criminality on the defendant's part.

2. *As to Deborah.* a. *Background.* Six months prior to trial, Deborah moved for disclosure of any and all information regarding "promises, inducements, or rewards of any kind or nature made directly or indirectly to any Commonwealth witness."

---

[2]The grand jury minutes show that witness Rosinski reported to the police that, on the day of the arson, he and his friends, including Steven, "decided to kick the ass of the kid [Spinney] that beat up Mike." The grand jury also heard testimony attributed to Windle that when the group, set on revenge, did not find Spinney at home they, including Steven, went to "get gas at a gas station, . . . came back with [a] container of gasoline and . . . set the house on fire." That testimony allowed the grand jury to determine that there was probable cause to reach the reasonable conclusion that Steven shared with the principals the specific intent to commit arson. The transcript amply supports the judge's finding that there was sufficient evidence presented to the grand jury that "Steven O'Neil and others went to . . . [Spinney's home] to help extract revenge for his brother[] [Michael] being beaten; that when the intended victim was not [at home] the group went to obtain gasoline for the purpose of returning to [Spinney's home] and setting fire to the dwelling; and that the group did return to the scene and Michael and another did set fire to the dwelling, while others in the group[, including Steven O'Neil,] remained in the getaway vehicle."

Two weeks before trial, on March 9, 1998, the Commonwealth responded with a document entitled "Commonwealth's Notice of Promises Rewards [or] Inducements" (Notice), signed for the Commonwealth by Assistant District Attorney Milton E. Cranney, Jr., who was the prosecutor at Deborah's trial.

The Notice stated, in pertinent part, as follows:

> *"Co-defendant Chuck Rosinski is expected to testify in the Commonwealth's case in chief* that Steven O'Neil and Debbie O'Neil were joint venturers along with Mike O'Neil, Chuck Rosinski and John Luciano in the burning of [Spinney's house] . . . . The substance of Mr. Rosinski's testimony is . . . [t]hat he along with his coventurers were at Debbie O'Neil's house . . . drinking beer provided to them by Ms. O'Neil. The group decided to go and beat the boys who had fought with Mike O'Neil earlier. They went to the [boys'] house, (Debbie drove) and threw rocks at the windows. When no one inside would come out, . . . Debbie O'Neil drove to a gas station and bought some gasoline. She put the gas in a milk jug. Debbie drove back to the house [and] . . . told Mikey to hurry up and do it. Mike O'Neil and Chuck Rosinski [then] . . . poured the gasoline and lit the building on fire. They ran back to the car and Debbie took off. They went back to Debbie's and she told them not to say anything to anyone about what had happened. *It is anticipated that this defendant will offer a change of plea on an indictment before the Essex County Juvenile Court on this matter and receive a sentence of probation."* (Emphasis supplied.[3])

Presumably relying on this Notice, Deborah's trial counsel

---

[3]This Notice also set forth the "expected" testimony of one John Luciano, another charged participant in the arson, to roughly the same effect as Rosinski's and similarly "anticipated" that Luciano would admit to sufficient facts "and receive a sentence of probation for his involvement in this crime." Luciano did not testify. At the trial, neither Rosinski nor anyone else testified that Deborah O'Neil obtained or provided the gasoline used in the arson, and Rosinski's testimony regarding the identity of the persons who "went to get gas" is unspecific and ambiguous. Rosinski did testify that Deborah expressed a desire to "fuck . . . up" the person who beat Michael, obtained that person's address, provided beer to the group on the night of the arson, encouraged the group to go to the address to "fuck him up," drove the group there, parked, waited for Michael and Rosinski to set the fire (telling them to "hurry up"), sped away from the scene thereafter, and told the group "there is not going to

began her opening by alerting the jury to the critical nature of Rosinski's testimony:

> "The Commonwealth's entire case rests on the credibility of two people, Charles Rosinski and John Luciano[,] . . . the only two people who have personal knowledge — [and] [w]ho the Commonwealth is going to call to testify — about what happened that night in that house. They are also the only two witnesses who were charged, with respect to this arson themselves, and are presently defendants with arson charges pending, and who the Commonwealth has given a deal to in exchange for their testimony. And you will hear both of them tell you that . . . after they are done testifying here, they expect that the charges against them will result in them being free, in one way or another, either by probation or some other situation such as that."[4]

Counsel did not, however, direct the jury's attention to the Notice and its apparent corroboration of her assertion in her opening.

Rosinski testified for the prosecution, incriminating Deborah as indicated in note 3, *supra*. Deborah's counsel then brought out on cross-examination that Rosinski had been drinking heavily (and illegally) the night of the fire, as well as smoking a large amount of marijuana; that he was "under the influence" of those substances that night; that his memory of the event was "somewhat shaky"; that he was "somewhat confused that night"; that he had "blacked out" a few times that evening; that he had provided two false and inconsistent statements to the authorities not mentioning any involvement by Deborah before making a third statement implicating her; that he had been on probation at the time of the incident and was aware of the consequences of being found in violation of probation; that he had a "complete memory" of his own actions on the night in

---

be any rats," i.e., not to tell anyone about what happened. Rosinski was the sole witness to place Deborah at the scene of the arson.

[4]As noted in note 3, *supra*, Luciano did not appear as a witness at the trial, and only Rosinski inculpated Deborah as a participant in the arson. The record is silent regarding the actual disposition of the charges against Luciano and Rosinski, whose trial was scheduled to take place a month after Rosinski testified.

question but not of anybody else's; and that he did not know where the gasoline used in the arson came from or who procured it. Counsel then moved on to what she must have contemplated would be the decisive blow to Rosinski credibility, the Commonwealth's Notice, but proceeded to flounder badly.

When she asked Rosinski if he had seen the document before, he responded, "No, I have not." Her request that he read it was met by a prosecution objection, which was sustained by the judge with the observation that Rosinski did not "claim a lack of memory, so there is nothing to refresh." The prosecutor at side bar then told the judge — questionably, in our view — that he himself had sent the document (which he described as a "letter") to the defendants' counsel but that it "is not even [Rosinski's] statement . . . [but rather] a representation of the substance [of his expected testimony] made by his attorney, who was present at this subsequent interview that took place." Defense counsel did not ask the judge to examine the Notice and made no protestation against the prosecutor's description of it.[5]

The judge reiterated her refusal to let Rosinski read the document "until [counsel had demonstrated] . . . an exhaustion of [the witness's] memory." In response to Deborah's counsel denying she was trying to refresh Rosinski's memory with the document, the judge asked, "[w]hat were you trying to do?" Counsel again made no effort to apprise the judge of the material nature of the Notice but rather replied obscurely that she wanted Rosinski "to read his purported statements . . . [and] to tell whether he had said things, or not said things." The judge thrice told counsel to "move on" in light of Rosinski's claim never to have seen the document before.

Deborah's counsel then asked Rosinski if he knew the

---

[5]If the prosecutor was taking the position that the Notice no longer fell within the category of "promises rewards [or] inducements," he was under a continuing duty to disclose that fact to the defense. Mass.R.Crim.P. 14(a)(4), 378 Mass. 875 (1979). *Commonwealth* v. *Bryant*, 390 Mass. 729, 747 (1984). His failure to have done so implied the continuing existence of the document as a "promise reward [or] inducement," and his less than candid description of it to the judge could be construed as an effort at "suppression by the prosecution of evidence favorable to an accused." *Commonwealth* v. *Hill*, 432 Mass. 704, 715 (2000), quoting from *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963).

potential penalty should he be convicted in his scheduled trial of committing the arson. After Rosinski acknowledged that his lawyer told him it could be five to eight years in State prison, the following exchange (in relevant part) occurred:

COUNSEL: "And is it fair to say that you don't expect to have a trial in this case. Is that right?"

ROSINSKI: "No."

COUNSEL: "Well, don't you have an agreement with the government to get probation in this case?"

ROSINSKI: "No."

COUNSEL: "When you met with the district attorney and your lawyer . . . you discussed what was going to happen to you, as a result of these charges. Right?"

ROSINSKI: "No."

COUNSEL: "So you don't know what is going to happen in your case?"

ROSINSKI: "No."

On that negative and inconclusive note, Deborah's counsel ended her cross-examination of Rosinski, never again mentioning the Notice.

On redirect examination of Rosinski, the prosecutor immediately revisited the subject of Rosinski's expectations:

PROSECUTOR: "Now, [Deborah's counsel] asked you what is going to happen in your case. What do you think is going to happen in your case?"

ROSINSKI: "That I'm going to jail."

This brief exchange — which can fairly be described as disingenuous, in view of the prosecutor's undeniable knowledge of the contents of the Notice[6] — provoked no response (much less indignant objection) from Deborah's counsel, who engaged in only a cursory recross of Rosinski that did not touch upon

---

[6]Compare *Commonwealth* v. *Collins*, 386 Mass. 1, 9 (1982) ("[W]here, either through misfeasance or nonfeasance by the prosecutor, false testimony is introduced concerning an arrangement between the witness and the prosecutor . . . [a] conviction will be set aside if there is 'any reasonable likelihood

the Notice or Rosinski's knowledge or understanding of the likely outcome of the charges pending against him.

Shortly thereafter, at a sidebar dealing with procedural matters, the prosecutor marked for identification a report about the arson prepared by a firefighter witness, which the court had the previous day ordered produced to the defense for examination. The prosecutor then casually "marked for identification purposes" the March 9 Notice (describing it as a "letter"). Deborah's counsel said nothing in response to this curious[7] action by the Commonwealth, and the record does not indicate whether the judge ever looked at the document. So far as it appears, the marking of the Notice did nothing to rectify the misleading impression that had been left with the jury (and quite possibly with the judge as well) as to the existence of some sort of understanding concerning the disposition of the Commonwealth's case against Rosinski.

In her closing, Deborah's counsel repeatedly stressed that the case against Deborah rested entirely on Rosinski's testimony and recalled the several facts brought out in cross-examination (see *supra* at 174-175) which cast doubt on Rosinski's credibility. She did not, however, refer either to the Notice or to her opening statement prediction that Rosinski would be revealed to be testifying and receiving probation pursuant to "a deal" with the Commonwealth. Instead, she weakly "suggested" that Rosinski's testimony about not expecting probation or any kind of prosecution favor as a result of his implicating Deborah in the arson was "not honest and believable." Steven's lawyer followed, stressing Rosinski's shifting stories, admitted lies, and "self-serving" final version of the facts.

---

that the false testimony could have affected the judgment of the jury'") (citations omitted).

[7]Marking a document for identification (aside from chalks and documents not yet formally offered in evidence) is the requisite offer of proof made by a proponent of the admission of the document in evidence after a trial judge has sustained an objection to its admission, so that the judge's decision to exclude it can be appealed. See *Commonwealth* v. *Polydores*, 24 Mass. App. Ct. 923, 924 (1987), and cases cited; Flannery, Massachusetts Evidence: A Courtroom Reference § 1.2.4 (MCLE 1999). We do not speculate on the prosecutor's motive here, in a situation in which there appeared to be no procedural reason for his marking the Notice for identification, except to note that documents marked for identification are not in evidence and cannot be shown to the jury. *Ibid.*

The prosecutor's summation opened by immediately focusing the jury's attention on Rosinski's credibility and the attacks made on it by the defense:

> "How is it self-serving for Chuck Rosinski to come in here and do what [Deborah] told him not to do? Tell the cops; rat them out. How is it self-serving for Chuck Rosinski to stand here and tell you, and be cross-examined by those lawyers, to tell you that he lit a house on fire?"

Deborah's attorney made no response to the prosecutor's implicit (and arguably guileful, in light of the Notice) portrayal of Rosinski as selfless and inherently credible in the circumstances.

b. *Ineffectiveness of counsel.* We agree with Deborah's main argument, that she was prejudicially deprived of effective assistance at trial.[8] Her trial counsel was provided with an invaluable means to subvert the testimony of the sole eyewitness against her — the "Commonwealth's Notice of Promises Rewards [or] Inducements" — but only vaguely alluded to it in her opening and then permitted herself to be stymied in her effort to utilize it as evidence or in cross-examination. Nor did she use it in summation, even though it had finally surfaced for record purposes, if only as a chalk.

It is long and well established that evidence tending to show a witness's bias, prejudice, or motive to lie is so significant that it is not considered a mere collateral matter but is deemed exculpatory evidence that may be established by extrinsic proof as well as by impeachment through cross-examination. See *Commonwealth* v. *DeBrosky*, 363 Mass. 718, 727 (1973); *Commonwealth* v. *Haywood*, 377 Mass. 755, 760 (1979); *Commonwealth* v. *Brown*, 394 Mass. 394, 397 (1985); *Commonwealth* v. *Schand*, 420 Mass. 783, 792-793 (1995); *Commonwealth* v. *Hamilton*, 426 Mass. 67, 72 (1997); *Commonwealth* v. *Gabbidon*, 17 Mass. App. Ct. 525, 531 (1983);

---

[8]Although a motion for a new trial is the recommended means of raising the issue of ineffective assistance of counsel, see *Commonwealth* v. *McCormick*, 48 Mass. 106, 107 (1999), such a claim may be resolved on direct appeal when, as here, the factual basis for the claim appears indisputably on the trial record. *Commonwealth* v. *Adamides*, 37 Mass. App. Ct. 339, 344 (1994).

*Commonwealth* v. *Hall*, 50 Mass. App. Ct. 208, 212 (2000); *Giglio* v. *United States*, 405 U.S. 150, 154-155 (1972); *Davis* v. *Alaska*, 415 U.S. 308, 320 (1974); *United States* v. *Abel*, 469 U.S. 45, 52 (1984); Liacos, Massachusetts Evidence §§ 6.7.1 & 6.9 (7th ed. 1999); Flannery, Massachusetts Evidence: A Courtroom Reference § 11.3 (MCLE 1999).

A criminal defendant has the undoubted " 'right . . . to reasonable cross-examination of a witness for the purpose of showing bias, particularly where that witness may have a motivation to seek favor with the government.' . . . A defendant has the *right* to bring to the jury's attention any 'circumstance which may materially affect' the testimony of an adverse witness which might lead the jury to find that the witness is under an 'influence to prevaricate' " (emphasis original). *Commonwealth* v. *Haywood*, 377 Mass. at 760 (citations omitted).

Contrary to the Commonwealth's implausible assertion — that the Notice did not even reflect any plea agreement or "deal" to exchange testimony for leniency, but was a mere hearsay statement of Rosinski's anticipated testimony as reported by his counsel, so that defense counsel's handling of it was not inadequate — the Notice fell squarely within the language just quoted from *Haywood*. That broad principle does not require an explicit contractual plea agreement for its application; rather, it entitles a defendant as of right to probe into any circumstance that could give rise to "any inference of prosecutorial favoritism [that might affect] . . . a jury's estimation of a witness's credibility," *Commonwealth* v. *Collins*, 386 Mass. 1, 10 (1982); "to pursue the possibility that [the witness] believed, or had been led to believe, that . . . some governmental conduct in his favor . . . was contingent on the nature and quality of his testimony," *Commonwealth* v. *DeBrosky*, 363 Mass. at 727; and to explore the issue of pending criminal charges against a witness because such "pendency . . . might have inspired hope of lenity [from the government] and fear of punishment if such lenity were not obtained." *Commonwealth* v. *Connor*, 392 Mass. 838, 841 (1984).

In short, "any statement which 'reasonably implies that the government . . . is likely to confer or withhold future advantages . . . depending on [the] witness'[s] cooperation,' "

*Commonwealth* v. *Schand,* 420 Mass. at 792, quoting from *United States* v. *Buendo,* 701 F. Supp. 937, 942 (D. Mass. 1998), aff'd sub nom. *United States* v. *Penta,* 923 F.2d 839 (1st Cir. 1990), or "any communication that suggests preferential treatment to a key government witness in return for that witness's testimony" is a crucial weapon in defense counsel's armamentarium, even if it is "vague as to the consideration given . . . [and] even without precise terms." *Commonwealth* v. *Hill,* 432 Mass. 704, 716-717 (2000). Cf. *Giglio* v. *United States,* 405 U.S. at 153 n.4 (a document containing even "an implication that the Government would reward the cooperation of the witness . . . tends to confirm . . . the existence of some understanding for leniency").

The Notice, stating Rosinski's anticipation of pleading guilty and receiving leniency (probation), despite being the actual arsonist, immediately after setting forth his expected testimony implicating Deborah O'Neil as the instigator and facilitator of the arson, provided defense counsel with the capstone of any impeachment of Rosinski. If there might be any tactical or strategic reason why defense counsel would have failed to make every effort to bring the Notice to the attention of the jury, so that they, as the sole triers of fact and credibility, could draw from it appropriately adverse inferences about the reliability of Rosinski as a witness, we are unable to discern it.

Since the Commonwealth's case against Deborah depended entirely on Rosinski's testimony, his credibility was essential to the prosecution. Rosinski's concessions regarding his intoxication and blackouts during the evening in question and his admittedly incomplete and confused memory of events had already eroded that credibility. Exposure of the substantial inducement impliedly offered Rosinski in the Notice for testifying favorably for the Commonwealth might well have tipped the balance in Deborah's favor on the outcome-determinative issue whether the Commonwealth's case satisfied the stringent test of proving her guilt beyond a reasonable doubt. See *Commonwealth* v. *Ellison,* 376 Mass. 1, 23 (1978) (the failure to disclose an inducement is evaluated in the context of the entire record, and when the evidence of guilt is not overwhelming, "additional evidence [of an exculpatory nature, even] of relatively minor importance

might be sufficient to create a reasonable doubt''); *Commonwealth* v. *Collins*, 386 Mass. at 10 ("We are aware of the effect that any inference of prosecutorial favoritism might have on a jury's estimation of a witness's credibility. . . . Such information was capable of creating a reasonable doubt which did not otherwise exist as to guilt'').

Instead, Deborah's counsel failed to bring the Notice to the jury's attention at any stage of the proceeding, despite the fact that she was entitled to do so independently of her cross-examination of Rosinski and of any denials of a deal by Rosinski. See *Commonwealth* v. *Gabbidon*, 17 Mass. App. Ct. at 531; *Commonwealth* v. *Hall*, 50 Mass. App. Ct. at 213 n.7.[9] Confronted by Rosinski's denials of ever having seen the Notice and of ever discussing with either his lawyer or the prosecutor what would happen to him as a result of being tried for arson — which, counsel could argue and the judge would invariably instruct, the jury were free to disbelieve — Deborah's counsel failed to exploit her most potent means of undermining Rosinski's unlikely claim of ignorance. Rosinski's counsel had in fact appeared on the first day of trial to assure the judge that she had "spoken at great length with . . . Rosinski" about the charges against him and the implications of his testimony and had "thoroughly advised [him] of [his] rights." Deborah's counsel could easily have summonsed Rosinski's attorney to testify to the circumstances attending her presumed receipt and understanding of and communications about the Notice, as could the assistant district attorney who had authored and distributed it. See *Commonwealth* v. *Michel*, 367 Mass. 454, 460-461 (1975); *Commonwealth* v. *Daughtry*, 417 Mass. 136, 144 (1994); *Davis* v. *Alaska*, 415 U.S. at 319-320.

Deborah's counsel's subsequent performance exacerbated the effect of her failure to produce this potentially vital exculpatory evidence for the jury. She first failed to object to the prosecutor's misleading redirect examination questioning of Rosinski to draw from him his expectation of going to jail. She then did not

---

[9]In this connection, we also note that counsel did nothing to disabuse the trial judge of her mistaken impression that the Notice was shown to Rosinski during cross-examination to refresh his recollection rather than as separate and independent evidence of bias and motive to lie.

take advantage of the renewed opportunity in recross examination of Rosinski to bring the Notice to the fore. Counsel's submergence of the Notice also impaired the effectiveness of her summation regarding Rosinski's lack of credibility by limiting it to his inconsistencies and ability to perceive and remember, rather than underscoring and validating her most telling contention (see *Commonwealth* v. *Collins*, 386 Mass. at 10), that Rosinski had a strong motivation to lie to curry favor with the prosecution. It additionally prevented her from objecting to the prosecutor's deceptive closing rhetoric (*supra* at 178) as a factually baseless and impermissible bolstering of, if not vouching for, Rosinski's truthfulness. Compare *id.* at 14; *Commonwealth* v. *Connor*, 392 Mass. at 842. Finally, it foreclosed any hope of being able to argue to the judge that the Notice amounted to an implicit promise of leniency contingent on Rosinski's testimony that merited a special instruction to the jury to scrutinize the witness's statement with particular care. Cf. *Commonwealth* v. *Ciampa*, 406 Mass. 257, 260 (1989); *Commonwealth* v. *Meuse*, 423 Mass. 831, 832 (1996).

Here, as in *Commonwealth* v. *Collins*, 386 Mass. at 10-14, the jury were deprived of "a clearer perception of the possibility of [a key prosecution witness's] bias" by not being made aware of evidence of an arrangement suggesting a Commonwealth offer of leniency to the witness; the evidence of the defendant's guilt was not overwhelming; the key witness's testimony was already "particularly vulnerable to even slight blows to its credibility"; and the prosecutor had given the jury the false impression that the witness was testifying even though he was going to jail, thereby "cloak[ing him] in an aura of credibility." In those circumstances, as in *Collins*, a reversal of a conviction dependent on such testimony is warranted.

The prosecutor's apparent misconduct in describing the Notice to the judge, in questioning Rosinski, and in closing argument might well be deemed "an independent ground for reversal," *id.* at 13, beyond the fact that it compounded the prejudicial impact of defense counsel's omissions. Compare *Commonwealth* v. *DeCicco, ante* 159, 165 (2001) (majority opinion); *id.* at 167 (dissent). It was defense counsel's "manifestly unreasonable" mishandling of the Notice, *Com-*

*monwealth* v. *Adams*, 374 Mass. 722, 728 (1978), that warrants a new trial. Counsel "essentially abandoned," *Commonwealth* v. *Sarvela*, 16 Mass. App. Ct. 934, 934 (1983), Deborah's most important impeachment weapon, proper utilization of which, in our view, not only "might have accomplished something material for the defense," *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977), but would "likely have made a difference in the result." *Commonwealth* v. *Anderson*, 398 Mass. 838, 839 (1986).[10,11]

*Conclusion.* The judgment with respect to Steven is affirmed. The judgment with respect to Deborah is reversed, and the verdict against her is set aside.

*So ordered.*

---

[10]"Despite the over-all quality of the defense, a mistake as serious in its likely effect as this amounts to ineffective assistance of counsel . . . [when] it is clear that, but for the error, there is a 'reasonable probability that . . . the factfinder would have had a reasonable doubt respecting guilt.' " *Commonwealth* v. *Rossi*, 19 Mass. App. Ct. 257, 260 (1985) (citation omitted).

[11]Deborah's complaint regarding the prejudicial impact of the judge's admission of a statement attributed to her in the testimony of another Commonwealth witness, Windle (to the effect that she wanted to "kill those little bastards" who beat Michael) need not detain us in view of the preceding discussion. It fails, in any event, because the judge rejected her contention that it constituted a violation of the prosecution's discovery obligation. Moreover, the record does not support her charge that the prosecutor knew about the statement before the witness blurted it out on the stand. The witness in fact admitted in cross-examination that he had not told the prosecutor about the statement, which appeared in none of the witness's own written statements or in the investigating officer's notes of interviews with the witness.