LOWY, J.
**764 Just after 10 P.M. on July 29, 2009, six month old Naiden Goitia (child) was pronounced dead at a hospital in Holyoke. The defendant, Edwin Goitia, was indicted for his murder. A jury in the Superior Court convicted the defendant of murder in the first degree on the theory of extreme atrocity or cruelty.[1] The defendant appeals from his conviction and from the denial of his motion for a new trial.
The defendant's arguments in his direct appeal are nearly identical to those he asserted in his motion for a new trial. He argues that defense counsel rendered ineffective assistance at trial by failing to impeach the credibility of the child's mother adequately, including that she also had been indicted for the child's murder, and that she was testifying pursuant to a cooperation agreement with the Commonwealth.[2] The defendant also claims that his right to due process was violated by the Commonwealth's failure to disclose that it allegedly agreed to dismiss criminal charges against the mother's father and step mother in exchange for the mother's cooperation; that the Commonwealth failed to produce certain photographs and a video recording; that evidence of injuries the child sustained in February, 2009, was admitted improperly **765 and that a limiting instruction should have been given; and that the prosecutor improperly vouched for the credibility of the child's mother in her closing argument. We discern no reversible error, and decline to exercise our authority under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial. Accordingly, we affirm the defendant's conviction of murder in the first degree and affirm the denial of the motion for a new trial. *998 Background. We summarize the facts as the jury could have found them, reserving certain details for later discussion. See Commonwealth v. Mendez, 476 Mass. 512, 513, 69 N.E.3d 968 (2017).
The mother and the defendant were involved in a relationship, and she became pregnant. Although she briefly stayed with the defendant, in approximately November, 2008, the mother moved into a third-floor apartment with another woman (roommate). The defendant came by the apartment "sometimes." After the child was born in January, 2009, the defendant was an infrequent visitor to the apartment.
In February, the child was hospitalized with bruises and other injuries on his body. The child was taken from the mother's custody by the Department of Children and Families (department) and ultimately placed in the custody of the maternal grandfather. After the mother completed parenting classes, she was allowed daily unsupervised visits with the child. In June, 2009, she took the child to live with her without informing the department.
During the one to two months before the child's death, the roommate, and a neighbor who lived in the building, saw the child almost every day. The neighbor became "fast friends" with the mother, and she babysat for the child several times. The child was a good, loving, happy, smiling, "bubbly" baby boy, who laughed a lot. When the defendant visited, however, the child screamed, cried, was "shaking and red, like he had been crying," and his lips would quiver.
On the day he died, several witnesses testified that the six month old behaved like "his normal self, happy and playful." After being given his dinner at the neighbor's apartment, he, his mother, and the neighbor and her children went to a nearby store for ice cream, where he interacted with the store employee, who testified that the child was normal in every respect, and smiled.
As the group returned to the apartment building between 6 and 6:45 P.M. , they met the defendant, who told the mother that he wanted to walk with her to a local liquor store to get something for them to drink that night. He wanted to leave on the walk soon, **766 but wanted to put the child to bed first. He declined to take the child along on the walk. Even though it was "really hot" outside, the defendant refused multiple offers of a ride, saying, "I want to walk with [the mother]." Although the neighbor offered to babysit the child in her apartment, the defendant refused, saying, "We will do the [baby] monitor like last time."
The defendant carried the child upstairs to the mother's apartment, while the mother remained downstairs; the roommate was not at home. After about five minutes, the mother went upstairs to retrieve something, returning within two minutes. Meanwhile, the roommate returned home, and she also went upstairs while the defendant was there, staying just long enough to get some clothes. She saw the defendant standing in the living room, holding the child so that his head was on the defendant's shoulder, with a blanket covering all but his legs, which were "hanging out," or "dangling." She moved to touch the child, but the defendant turned away without her being able to see the child's face. The defendant then walked into the mother's room and closed the door.
Within one minute of returning downstairs, the roommate went back to the apartment to retrieve her forgotten keys. The mother's bedroom door was still closed. Shortly after the roommate left, the defendant came downstairs. He reported that the child had not cried, was sleeping, and that he was "knocked out." When asked for the keys to the mother's apartment so that the door could be locked, the *999 defendant went upstairs by himself, and returned "very quickly." He asked to use the neighbor's bathroom, and then he and the mother left for the liquor store. He never gave the neighbor the keys to the mother's apartment so that she could check on the child.
At approximately 7:30 P.M. , the mother and the defendant arrived at the liquor store. While the mother chatted with the store employee, the defendant remained standing, three or four feet behind her, by the door, standoffish and aloof, pacing and glaring, as if he were ready to leave.
While the defendant and the mother were away, the neighbor sat in the hallway of her apartment, where she could hear if the child made any sound; she heard nothing. Eventually, the mother appeared at the neighbor's apartment, reporting that she and the defendant had returned. A short while later, between 8 and 8:30 P.M. , the neighbor went up to the mother's apartment to return the child's diaper bag and some toys. When she went inside, the mother **767 and the defendant were sitting on separate couches in the living room. The defendant seemed jumpy or antsy, like he could not sit still. Before she left, the neighbor asked to "peek at [the child]," but the defendant responded, "No, you might wake him up."
At about 10 P.M. , the mother's father (grandfather), arrived at the apartment building in his truck. The grandfather and a different neighbor who had been outside ran up to the mother's apartment. When they entered, the mother and the defendant were on either side of the child, who was on the floor, not breathing. The neighbor picked him up and started cardiopulmonary resuscitation (CPR). Instead of telephoning 911, the grandfather began driving the group to the hospital while the neighbor continued to perform CPR. The mother and the defendant sat in the backseat. The child remained limp, his condition unchanged. During the drive, the defendant stated, "They're going to blame me. I've been drinking." Before reaching the hospital, the grandfather stopped the truck so that the defendant could get out.
The child was pronounced dead a short time after arriving at the hospital. No external signs of trauma were observed. When an autopsy was performed, the cause of death was determined to be craniocervical trauma resulting from two distinct blunt force traumatic injuries -- a force comparable to that sustained from a fall from a five-story building or in a motor vehicle crash. The Commonwealth presented the testimony of a forensic pathologist and the medical examiner who examined the child's brain injuries and skull fractures, and of a pediatrician with a subspecialty in child abuse pediatrics, which demonstrated that the injuries occurred the night the child died. In addition, because of the severity of the injuries, the child would not have acted normally after sustaining them. Instead, within minutes the child would have developed symptoms ranging from irritability, unusual balance, difficulty remaining awake, vomiting, seizures, changes in breathing, and, ultimately, coma. A caregiver would have recognized that the child was not well. Because the child had exhibited normal behavior at approximately 7 P.M. , and was discovered unresponsive at 10 P.M. , the injuries were sustained between those hours.
The defense stressed that many others had more access to the child than the defendant did. Through the defendant's medical expert, the defendant sought to show that the child suffered his injuries prior to the night he died. However, his expert also admitted that the multiple fractures resulted from two separate **768 impacts to the child's head and appeared fresh, and that the child would "probably not" have *1000 acted normally after receiving the skull fractures.
After the defendant was convicted, he filed a motion for a new trial. The motion judge, who was also the trial judge, denied the motion.[3]
Discussion. Where we consider, as we do here, a defendant's direct appeal from a conviction of murder in the first degree together with an appeal from the denial of a motion for a new trial, we review the whole case under G. L. c. 278, § 33E. See Commonwealth v. Alicea, 464 Mass. 837, 840, 985 N.E.2d 1197 (2013). We give "special deference to factual determinations made by [the] motion judge who also was the trial judge." Id., quoting Commonwealth v. Leng, 463 Mass. 779, 781, 979 N.E.2d 199 (2012).
1. Ineffective assistance of counsel. Because the defendant was convicted of murder in the first degree, we evaluate his claim of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice. See Alicea, 464 Mass. at 845, 985 N.E.2d 1197, citing Commonwealth v. Gonzalez, 443 Mass. 799, 808, 824 N.E.2d 843 (2005). In this context, "we consider a defendant's claim even if the action by trial counsel does not constitute conduct 'falling measurably below that ... of an ordinary fallible lawyer.' " Gonzalez, supra at 808-809, 824 N.E.2d 843, quoting Commonwealth v. MacKenzie, 413 Mass. 498, 517, 597 N.E.2d 1037 (1992). Our task is to determine "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." Commonwealth v. Wright, 411 Mass. 678, 682, 584 N.E.2d 621 (1992), S.C., 469 Mass. 447, 14 N.E.3d 294 (2014). Where the claimed error is one involving trial counsel's tactical or strategic decisions, see Commonwealth v. LaCava, 438 Mass. 708, 713, 783 N.E.2d 812 (2003), those decisions "will not be deemed ineffective unless manifestly unreasonable when made." Commonwealth v. Vao Sok, 435 Mass. 743, 758, 761 N.E.2d 923 (2002).
The defendant argues that counsel was ineffective in failing to cross-examine the mother concerning her cooperation agreement with the Commonwealth or effectively to expose a number of lies and inconsistencies in her testimony.
**769 The agreement stated that, in exchange for the mother's provision of truthful and complete information, the Commonwealth would "engage in a results oriented review of the nature, extent and significance of [her] cooperation." It also provided:
"In exchange for your cooperation and assistance, this office will reflect the results of your cooperation and your role in bringing them about, in its charging and/or sentencing decisions. At your request, this office will bring the nature and extent of your cooperation to the attention of the court. This office agrees to be reasonable in its exercise of discretion in charging and sentencing recommendations under this agreement. This office will not give you any consideration in its charging and/or sentencing decisions if your cooperation fails to produce significant results."
Although he was aware of the agreement, defense counsel inexplicably failed to *1001 impeach the mother with either its existence or contents. This was error. In her memorandum of decision and order denying the defendant's motion for a new trial, the judge accepted co-counsel's admission that the decision was an "omission" rather than a tactical decision. She concluded, however, that the evidence of the defendant's guilt was overwhelming and that the error did not give rise to a substantial likelihood of a miscarriage of justice. We agree.[4]
Although informing the jury of the existence of a cooperation agreement would have been a "powerful impeachment tool," the error in failing to do so does not, by itself, require a new trial. See Commonwealth v. Ellison, 376 Mass. 1, 23, 379 N.E.2d 560 (1978) ; Commonwealth v. O'Neil, 51 Mass. App. Ct. 170, 180-181, 744 N.E.2d 86 (2001), S.C., 436 Mass. 1007, 765 N.E.2d 767 (2002) ; Mass. G. Evid. § 1104 (2018). To require reversal, the error must have been "likely to have influenced the jury's conclusion" (citation omitted). Commonwealth v. Mercado, 466 Mass. 141, 147, 993 N.E.2d 661 (2013). Here, the mother's testimony was not essential to the Commonwealth's case.
The Commonwealth focused on proving that the fatal injuries were sustained the night the child died, and establishing that only the defendant was alone with him at the time he was being put to bed. The Commonwealth offered evidence from multiple medical **770 experts that the child sustained two separate skull fractures that were caused by blunt force impacts, and that these impacts occurred between 7 and 10 P.M. on the night the child died. In addition, other witnesses -- who were unhampered by discernable bias -- corroborated the mother's account that only the defendant was alone with the child that evening, and that the child had appeared happy and healthy before the defendant arrived, including during the visit to the ice cream store, where the employee observed him to be perfectly normal and smiling. The defendant was described as "standoffish" and unwilling to permit others to see the baby's face, at a time the child was reportedly sleeping. Further, the defendant emphatically denied being alone with the child, despite substantial evidence to the contrary. In short, the Commonwealth's case was compelling, separate and distinct from the credibility of the mother's testimony.
Moreover, we have reviewed the evidence without relying on any of the mother's uncorroborated testimony, and conclude that any failure to impeach the mother with evidence of her written cooperation agreement with the Commonwealth did not create a substantial likelihood of a miscarriage of justice. Without the mother's testimony, the remaining evidence supporting the defendant's conviction was overwhelming. In these circumstances, we cannot conclude that a more expansive cross-examination would have "accomplished something material for the defense" (citation omitted), Commonwealth v. Egardo, 426 Mass. 48, 52, 686 N.E.2d 432 (1997), or that the verdict would have been different. See Commonwealth v. Shea, 401 Mass. 731, 744, 519 N.E.2d 1283 (1988), citing Commonwealth v. Florentino, 396 Mass. 689, 690, 488 N.E.2d 403 (1986). Contrast O'Neil, 51 Mass. App. Ct. at 180, 744 N.E.2d 86 (case depended entirely on credibility).
Concerning the defendant's argument that his counsel was ineffective for not eliciting the mother's bias and motive to lie, there was no error. Defense counsel *1002 was successful in impeaching the mother's credibility and in conveying to the jury that the mother had a motive to lie.
"[A] defendant is entitled to reasonable cross-examination of a witness for the purpose of showing bias," Commonwealth v. Hardy, 464 Mass. 660, 667, 984 N.E.2d 727, cert. denied, 571 U.S. 903, 134 S.Ct. 248, 187 L.Ed.2d 184 (2013), but failure to use particular methods of impeachment at trial rarely rises to the level of ineffective assistance of counsel. See Commonwealth v. Fisher, 433 Mass. 340, 357, 742 N.E.2d 61 (2001).
"Impeachment of a witness is, by its very nature, fraught with **771 a host of strategic considerations, to which we will, even on § 33E review, still show deference. Furthermore, absent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion." (Footnote omitted.)
Id.
Here, defense counsel's cross-examination of the mother provided a substantial basis for defense counsel to plant the seed with the jury that it was the mother (or a third party) who caused the child's death, and that it was her desire to shift the blame to the defendant that motivated her testimony. He elicited that she also had been charged with murder and reckless endangerment of the child, failed to telephone 911 when she found the child unresponsive, and implied that she regularly endangered her child by allowing him to sleep in her bed instead of in his crib. She admitted that she had been convicted of larceny and was on probation when the child died. Defense counsel garnered the mother's admission that, in June, 2009, she knowingly violated the terms of the existing custody order by failing to return the child to his grandfather. He highlighted that she lied about the custody arrangement in her first statement to the police after the child's death, and that she failed to implicate the defendant in the child's death in her statement to the police. Defense counsel's examination of other witnesses served further to impeach the mother's credibility.[5] See Commonwealth v. Garuti, 454 Mass. 48, 59, 907 N.E.2d 221 (2009) ("trial counsel, in essence, touched on all the issues the defendant raises, albeit in different form than the defendant would have liked").
Moreover, defense counsel effectively elicited from the mother testimony that supported the defendant's theory at trial: that the defendant lacked access to the child when he was fatally injured days before he died. The mother's testimony, more than any other **772 witness, supported the theory, because she specifically testified that he was not alone with the child during that period. Defense counsel used the word "access" in his opening statement no less than fifteen times to emphasize that people other than the defendant had access to the child. If the jury had credited the defense's medical evidence that the child's injury was a few days old, then the mother's testimony would have provided critical factual support for the defendant's *1003 theory. See Commonwealth v. Garvin, 456 Mass. 778, 789 n.13, 926 N.E.2d 169 (2010) (decision not to highlight issue during cross-examination reasonable where it would harm own theory of defense); Commonwealth v. Knight, 437 Mass. 487, 502-503, 773 N.E.2d 390 (2002). See also Commonwealth v. Mosher, 455 Mass. 811, 826, 920 N.E.2d 285 (2010). Thus, counsel had a fine line to tread between impeaching the mother by insinuating that she was responsible for the murder and concomitantly eliciting favorable testimony from her. Counsel was not ineffective in his impeachment of the mother, and the decision to rely on the defense medical expert's testimony, rather than focusing on using the mother's motive to blame the defendant for the child's death, and to argue those points before the jury, was not manifestly unreasonable. See Commonwealth v. Smith, 456 Mass. 476, 482, 924 N.E.2d 270 (2010) ; Commonwealth v. Diaz, 448 Mass. 286, 288-289, 860 N.E.2d 665 (2007).
2. Due process claim. The defendant contends that his due process right to a fair trial was violated because, although the Commonwealth disclosed a cooperation agreement it had with the mother, it did not disclose purported additional rewards or inducements for her testimony. Namely, the Commonwealth supposedly agreed to dismiss charges against the mother's father and stepmother. See Commonwealth v. Burgos, 462 Mass. 53, 62, 965 N.E.2d 854, cert. denied, 568 U.S. 1072, 133 S.Ct. 796, 184 L.Ed.2d 589 (2012). See also Commonwealth v. Hill, 432 Mass. 704, 711, 739 N.E.2d 670 (2000). He argues that if the jury had been aware of these supposed additional rewards, they would have considered the mother's testimony in a different light.
There is no evidence to support the defendant's claim that the charges were dismissed as a reward for the mother's testimony. See Commonwealth v. Laguer, 448 Mass. 585, 594, 863 N.E.2d 46 (2007). In these circumstances, the judge correctly rejected the claim as "entirely speculative" and "unsupported by anything other than the defendant's presumptions." See Commonwealth v. Rebello, 450 Mass. 118, 123-124, 876 N.E.2d 851 (2007). To be sure, the Commonwealth is obligated to provide the terms of any cooperation agreement with a witness the Commonwealth intends to call at trial. See **773 Mass. R. Crim. P. 14 (a) (1) (A) (ix), as amended, 444 Mass. 1501 (2005). See also Burgos, 462 Mass. at 62, 965 N.E.2d 854. In this case, the terms of the cooperation agreement between the Commonwealth and the mother expressly describe the charges for which the Commonwealth would take the mother's cooperation into consideration. Nothing in the agreement has an impact on the charges against her father or stepmother.
3. Failure to disclose videotape and photographs. The Commonwealth concedes that, prior to trial, it did not provide the defendant with a videotape of the crime scene, i.e., the apartment shared by the mother and her roommate. It contends, however, that a new trial is not warranted because the videotape was not used as evidence at trial, and it was cumulative of still photographs that were provided to the defendant. Other photographs, taken by the roommate, were allegedly sent to a State police trooper by the roommate and likewise not produced. However, the trooper's affidavit, which the motion judge explicitly credited, indicated that he never received them, and the Commonwealth contends that it cannot be required to produce evidence that is not within its custody or control. See Laguer, 448 Mass. at 594, 863 N.E.2d 46 ; Ellison, 376 Mass. at 22, 379 N.E.2d 560. See also Commonwealth v. Schand, 420 Mass. 783, 787-789, 653 N.E.2d 566 (1995) ;
*1004 Commonwealth v. Daye, 411 Mass. 719, 734, 587 N.E.2d 194 (1992).
There was no error in the trial judge's denial of the motion for a new trial, without an evidentiary hearing, on this issue. The only use to which the defendant suggests the photographs and videotape could have been put -- that the child slid off the mother's bed and hit his head -- would directly have contradicted the defendant's trial strategy, that the child had been injured days before his death, irrespective of the overwhelming evidence of the defendant's guilt. Because there is nothing to suggest that the videotape contained exculpatory evidence or that it would have affected the outcome of the trial, and nothing to demonstrate that the Commonwealth received photographic evidence from the roommate, a new trial is not required. See Commonwealth v. Tucceri, 412 Mass. 401, 414, 589 N.E.2d 1216 (1992).
4. Evidence of prior injury. Before trial, the Commonwealth filed a motion in limine to admit evidence of the bruising injuries the child sustained in February, 2009. The judge allowed the motion. Although the evidence was not admissible to demonstrate the defendant's propensity to commit murder, see Commonwealth v. Anestal, 463 Mass. 655, 665, 978 N.E.2d 37 (2012), the Commonwealth sought **774 leave to use the evidence for a nonpropensity purpose: to demonstrate a pattern of behavior between the defendant and the victim, i.e., when the defendant was alone with the child, he was injured. See Commonwealth v. Beneche, 458 Mass. 61, 80-81, 933 N.E.2d 951 (2010) ; Commonwealth v. Butler, 445 Mass. 568, 573-576, 839 N.E.2d 307 (2005). See also Mass. G. Evid. § 404(b).
The judge determined that the child's injuries, sustained approximately five months before his death, were reasonably connected to the facts of this case and sufficiently proximate in time to be probative. See Butler, 445 Mass. at 574, 839 N.E.2d 307. She also determined that the probative value of the evidence was not outweighed by the risk of unfair prejudice to the defendant. See Commonwealth v. Crayton, 470 Mass. 228, 249, 21 N.E.3d 157 (2014) ; Anestal, 463 Mass. at 665, 978 N.E.2d 37. The defendant argues, however, that the judge erred in admitting the evidence because the Commonwealth failed to demonstrate by a preponderance of the evidence that a reasonable jury could find that it was the defendant who had caused the prior injuries. See Commonwealth v. Leonard, 428 Mass. 782, 785-786, 705 N.E.2d 247 (1999). Mass. G. Evid. § 104(b).
We recognize that, at the hearing on the motion, the prosecutor represented that "no one was charged" for the February, 2009, bruising, although the mother had been indicted for child endangerment. We also recognize that the mother's statement to the police indicated that the defendant was not alone with the child at the time of the February, 2009, incident. Her trial testimony, however, indicated that the defendant was alone with the child the day the injuries were discovered, and that she heard the child cry. She also testified that the defendant visited him only once while he was hospitalized. The judge was correct in determining that a reasonable jury could find that the defendant inflicted the injuries the child sustained in February, 2009. See Mass. G. Evid. § 104(b).
Although evidence of prior bad acts "carries with it a high risk of prejudice to the defendant," Commonwealth v. Barrett, 418 Mass. 788, 795, 641 N.E.2d 1302 (1994), and a limiting instruction directing the jury not to consider evidence of the defendant's culpability in the child's prior injuries as proof of his character or propensity to commit the crime at bar *1005 would have been warranted, trial counsel failed to request such an instruction. See Commonwealth v. Leonardi, 413 Mass. 757, 764, 604 N.E.2d 23 (1992). In this case, the judge found that counsel's decision not to request an instruction was a tactical one: it would have drawn the jury's attention to the **775 bruising, just before they began deliberation. See Commonwealth v. Washington, 449 Mass. 476, 488, 869 N.E.2d 605 (2007) (limiting instruction could have undermined defense strategy). In the circumstances, the lack of an instruction did not give rise to a substantial likelihood of a miscarriage of justice. See id. See also Commonwealth v. Mercado, 456 Mass. 198, 205 n.14, 922 N.E.2d 140 (2010).
5. Prosecutor's closing argument . During his closing argument, the prosecutor stated that the "credible, believable" evidence told the jury what had happened. Because the judge overruled the defendant's objection, we consider whether the prosecutor's comments were improper and, if they were, whether the error was prejudicial. See Commonwealth v. Pearce, 427 Mass. 642, 644, 695 N.E.2d 1059 (1998). We conclude there was no error.
As we have said, "[w]ithin the bounds of the evidence and the fair inferences from the evidence, great latitude should be permitted to counsel in argument." Commonwealth v. Gilmore, 399 Mass. 741, 745, 506 N.E.2d 883 (1987). Counsel may not, however, "express[ ] a personal belief in the credibility of a witness ... or ... indicate[ ] that he or she has knowledge independent of the evidence before the jury verifying a witness's credibility." Pearce, 427 Mass. at 644, 695 N.E.2d 1059, quoting Commonwealth v. Ciampa, 406 Mass. 257, 265, 547 N.E.2d 314 (1989). In this case, although the prosecutor referred to the "credible evidence" and "credible, believable evidence," the choice of a particular word or words is not determinative.
To be sure, "prosecutors are held to a stricter standard than are errant defense counsel and their clients" (citation omitted). Commonwealth v. Arroyo, 442 Mass. 135, 147, 810 N.E.2d 1201 (2004). The evidence presented to the jury required them to decide between conflicting versions of events, and the prosecutor properly could argue which version of the evidence was more credible. See Commonwealth v. Deloney, 59 Mass. App. Ct. 47, 53, 794 N.E.2d 613 (2003). In that context, the prosecutor challenged the evidentiary underpinnings of the defendant's argument concerning the timing of the child's injuries, and the argument was within the right of retaliatory reply. See Commonwealth v. O'Connell, 432 Mass. 657, 660, 738 N.E.2d 346 (2000), citing Commonwealth v. LeFave, 407 Mass. 927, 939, 556 N.E.2d 83 (1990). See Commonwealth v. Ortega, 441 Mass. 170, 180-182, 804 N.E.2d 345 (2004). The trial judge was within her discretion to determine that, in the circumstances presented, the statements neither vouched for the credibility of a particular witness, nor implied that the prosecutor had any personal knowledge outside the evidence at trial to assert that the witness was believable.
**776 Conclusion. Considering the case as a whole, we conclude that the conviction was amply supported by the evidence and decline to exercise our power under G. L. c. 278, § 33E. The judgment is affirmed, as is the order denying the motion for a new trial.
So ordered.

The defendant also was convicted of reckless endangerment of a child and assault and battery. Those indictments were dismissed on the ground that they were subsumed within the defendant's conviction of murder.

The child's mother also was indicted for reckless endangerment of a child, based on injuries her child sustained in February, 2009. Two days after the defendant was convicted of murder in the first degree, the Commonwealth entered a nolle prosequi with respect to the murder indictment against her. Weeks later, the Commonwealth was permitted to amend the date of the offense on the reckless endangerment indictment to July 29, 2009, the date of her child's death.

The judge conducted a hearing concerning the motion for a new trial, the evidentiary portion of which was limited to issues relating to the Department of Children and Families. In the circumstances, a broader evidentiary hearing was not required. See Commonwealth v. Lopez, 426 Mass. 657, 663, 690 N.E.2d 809 (1998) (evidentiary hearing required only where substantial issue raised, supported by substantial evidentiary showing).

If defense counsel had made known to the jury the mother's cooperation agreement, the defendant would have been entitled to a jury instruction in accordance with Commonwealth v. Ciampa, 406 Mass. 257, 264, 547 N.E.2d 314 (1989).

The defense strategy of casting the mother in culpable light was supported by the testimony of the neighbor who performed CPR on the child. She testified that, while the group was en route to the hospital, the mother was focused on obfuscating her culpability for violation of the custody order rather than on the child's condition. Further, when the defendant said that authorities were going to blame him, the mother responded that he had not done anything. Defense counsel also elicited the testimony of this witness that, while at the child's bedside, the mother only cried and became emotional while other people were present.