## Commonwealth vs. Juan Pablo Alicea.

Worcester. December 7, 2012. - April 12, 2013.

Present: Ireland, C.J., Spina, Botsford, Gants, & Lenk, JJ.

*Homicide. Assault and Battery by Means of a Dangerous Weapon. Constitutional Law,* Self-incrimination, Assistance of counsel, Identification. *Evidence,* Testimonial privilege, Identification, Expert opinion. *Due Process of Law,* Identification. *Witness,* Privilege, Self-incrimination, Competency, Expert. *Identification. Jury and Jurors. Practice, Criminal,* Capital case, In camera inspection, Verdict, New trial, Assistance of counsel, Motion to suppress, Jury and jurors, Voir dire.

In a criminal matter, the record amply supported the Superior Court judge's conclusion that a witness had a valid claim of privilege under the Fifth Amendment to the United States Constitution; further, the judge did not err in excluding defense counsel from the in camera hearing on the witness's claim of privilege, and the defendant suffered no prejudice from the exclusion. [840-843]

There was no merit to the criminal defendant's claim that, at trial, the jury's verdict on the offense of assault and battery by means of a dangerous weapon was not unanimous. [843-845]

A Superior Court judge did not err in denying the criminal defendant's motion for a new trial, where defense counsel was not ineffective in failing to challenge one victim's competency to testify or in moving to strike the victim's testimony [845-846], in failing to move to suppress the victim's identification of the defendant [847-848], in failing to request additional voir dire of a juror [848-849], in failing to move to strike the testimony of a witness [849-850], or in failing to call certain expert witnesses [850-852].

At a murder trial, the evidence was sufficient to establish the element of extreme atrocity or cruelty, where the Commonwealth presented evidence that the defendant inflicted multiple gunshot wounds on the victim and that the defendant smiled and then frowned immediately after the victim fell. [852-854]

Indictments found and returned in the Superior Court Department on July 15, 2002.

The cases were tried before *Jeffrey A. Locke,* J., and a motion for a new trial, filed on December 21, 2009, was considered by him.

*Greg T. Schubert* for the defendant.

*Stephen J. Carley*, Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. In January, 2004, a Superior Court jury found the defendant, Juan Pablo Alicea, guilty of murder in the first degree of Hylas Strange, III, based on a theory of extreme atrocity or cruelty,[1] and assault and battery of Larisa Andujar by means of a dangerous weapon.[2] The charges concerned a shooting on the outdoor stairs of an apartment building that resulted in the death of Strange and a gunshot wound to Andujar. The defendant appeals from his convictions and from the trial judge's denial of his motion for a new trial. He argues that the judge erroneously accepted the assertion by a witness of privilege under the Fifth Amendment to the United States Constitution and conducted a defective hearing on the witness's claim of privilege; the jury's verdict of assault and battery by means of a dangerous weapon was not unanimous; the judge erred in denying the defendant's motion for a new trial because the defendant's trial counsel provided him with ineffective assistance in several respects; and the evidence was insufficient to prove extreme atrocity or cruelty. We affirm the defendant's convictions and the denial of his motion for a new trial, and after a thorough review of the record, we decline to exercise our power to grant relief under G. L. c. 278, § 33E.

*Background.* We recite the facts as the jury could have found them at trial, reserving some facts for later discussion.

On the afternoon on May 15, 2002, at about 3 P.M., Andujar, who was at the time a heroin user, woke up and injected three bags of heroin.[3] She was with Strange, her boy friend. Strange received a telephone call from the defendant, a friend of both Andujar and Strange whom they had known for a year. The defendant told Strange that he had figured out that Strange had not stolen a stereo from the defendant's sister, and he was no longer upset with Strange. The defendant, who was at 833 Main Street in Worcester, invited Strange and Andujar over because he had heroin. They decided to go.

---

[1]The Commonwealth also proceeded on a theory of deliberate premeditation, but the jury did not find the defendant guilty on that theory.

[2]The jury also found the defendant not guilty on the charge of assault with intent to murder Andujar.

[3]Andujar needed to consume seven bags of heroin in order to "get high."

That same afternoon, Petra Moreno arrived at her apartment on the third floor of 833 Main Street to find signs of a break-in and two men, including the defendant, standing on the third-floor porch. The defendant identified himself as the brother of Moreno's next-door neighbor and told Moreno that someone called "Gucci," a nickname by which Strange was known, had broken into the neighbor's apartment and probably had broken into Moreno's apartment. The defendant said, "We're going to take care of it."

After Strange's telephone conversation with the defendant, Andujar's mother drove Andujar and Strange to the corner of Main Street and Allen Street. Andujar and Strange walked to the parking lot of 833 Main Street, looked up, and saw the defendant standing on the third-floor porch with another person, Eliezer Herrera. The defendant motioned for Andujar and Strange to climb the steps. When they reached the second-floor landing, Strange ascended the first two steps to the third floor in front of Andujar, and as Andujar looked down to take her first step, she heard a gunshot and looked up to see the defendant shooting at them. Strange jumped back off the steps, jumped in front of Andujar, pushed her to the side, took two steps, and then fell after another shot. Andujar looked up and saw the defendant smile, then frown, and run out of sight. Strange was lying on the porch, nonresponsive, with his eyes open and blood pooling around his head. Strange sustained a total of four gunshot wounds, including a fatal wound to his head, and a bullet grazed Andujar's right shoulder. Andujar then ran down the steps and up the hill to her mother's vehicle.

About twenty minutes after Moreno spoke with the defendant on the porch, she heard between three and five gunshots. Moreno ran outside and saw a body on the second-floor porch and then saw Andujar running along Allen Street.

The defendant's trial occurred in January, 2004, and he timely filed a notice of appeal from his convictions. While the defendant's appeal was pending in this court, the defendant, represented by new counsel, filed a motion for a new trial on December 21, 2009. The motion judge, who was also the trial judge, denied the motion in a comprehensive memorandum of decision in August, 2011. The defendant timely appealed, and his consoli-

dated appeals from his convictions and the denial of his motion for a new trial are now before this court.

*Discussion.* When this court reviews a defendant's appeal from the denial of a motion for a new trial in conjunction with his direct appeal from an underlying conviction of murder, we review both under G. L. c. 278, § 33E. See, e.g., *Commonwealth* v. *Gomez,* 450 Mass. 704, 711 (2008). In conducting our review, "[w]e extend special deference to factual determinations made by a motion judge who also was the trial judge, as here." *Commonwealth* v. *Leng,* 463 Mass. 779, 781 (2012), citing *Commonwealth* v. *Grace,* 397 Mass. 303, 307 (1986).

1. *Witness claim of Fifth Amendment privilege.* At a hearing on the parties' pretrial motions on January 16, 2004, the judge reviewed the Commonwealth's proposed application for a grant of immunity pursuant to G. L. c. 233, § 20E, for the witness Eliezer Herrera, whom the defendant argued was the shooter. The judge concluded that the hearing on the Commonwealth's immunity application could not take place then because the prosecutor had not notified the Attorney General or other district attorneys of the application, as required by G. L. c. 233, § 20E (*d*). The judge decided instead to determine later that day whether the proposed witness had a valid basis for a claim of Fifth Amendment privilege, and to hear the full immunity application at a later point in time, after the Commonwealth had satisfied the notice requirements. Thereafter, during the same January 16 hearing, counsel for Herrera, citing *Commonwealth* v. *Martin,* 423 Mass. 496 (1996), requested that a voir dire of Herrera be conducted in camera to assess the witness's claim of privilege. Over defense counsel's objection to an in camera voir dire of "a potentially devastating witness like Mr. Herrera," the judge conducted a closed hearing to determine whether Herrera would assert the Fifth Amendment if called to testify and whether such a claim of privilege would be valid. The judge excluded the defendant and defense counsel from the hearing but permitted the prosecutor to attend. At the end of the hearing, the judge found that Herrera had validly invoked his Fifth Amendment privilege "based on [the judge's] understanding of Mr. Herrera's involvement in the case . . . , the facts and circumstances

giving rise to a shooting and resulting in charges against [the defendant], and bearing in mind Mr. Herrera's pending legal cases in the Worcester District Court . . . ."[4] The judge initially impounded the portion of the transcript reflecting the content of this hearing, but later made it available to the parties at the request of the defendant's appellate counsel. Nothing in the record indicates that the Commonwealth pursued further an immunity application for Herrera; in any event, Herrera was not called as a witness.

The defendant claims that Herrera was actually a defense witness and argues that the judge erred in depriving the defendant of Herrera's testimony by concluding that Herrera had a right not to testify. The premise of this argument, that Herrera was a defense witness, fundamentally mischaracterizes the record below. As the judge stated in his decision on the defendant's new trial motion, "[c]ontrary to [the defendant's] claim that *he* sought to call Herrera as a trial witness, . . . the trial transcripts show otherwise" (emphasis in original). Herrera's name first appears in connection with the Commonwealth's intention to immunize him, and in the closed hearing on whether he had a valid privilege, the judge told Herrera that "the Commonwealth . . . intends to call you as a witness." Indeed, the defendant's trial counsel described Herrera as "a potentially devastating witness." Trial counsel had ample reason not to call Herrera. The theory of the defense at trial was that Herrera, and not the defendant, had committed the shootings. If true, this information would by itself justify a claim of privilege; if false, it likely would lead Herrera to deny the defense theory and identify the defendant as the shooter.

Setting aside this mischaracterization, we turn to the validity of Herrera's claim of privilege.[5] We have long held that "[a] witness may refuse to testify unless it is *perfectly clear*, from a

---

[4]As of January, 2004, Herrera had several outstanding charges relating to drug offenses and firearm possession from December, 2002, and November, 2003, respectively.

[5]The defendant did not raise a substantive challenge to the trial judge's conclusion that Herrera validly had invoked his privilege under the Fifth Amendment to the United States Constitution before or during trial or in his motion for a new trial. The issue accordingly was not addressed in the judge's decision on the motion.

careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency to incriminate" (emphasis in original). *Pixley* v. *Commonwealth*, 453 Mass. 827, 832 (2009) (*Pixley*), quoting *Commonwealth* v. *Funches*, 379 Mass. 283, 289 (1979). The privilege "extends not only to answers that would in themselves support a conviction, but also to those that would furnish a link in the chain of evidence needed to prosecute the witness." *Commonwealth* v. *Freeman*, 442 Mass. 779, 785 (2004), citing *Commonwealth* v. *Dagenais*, 437 Mass. 832, 839 (2002). See *Hoffman* v. *United States*, 341 U.S. 479, 486 (1951).

The record reflects ample support for the judge's conclusion that Herrera had a valid Fifth Amendment privilege. First, if the defense theory were correct, Herrera's testimony could well implicate him as the shooter in the present case. In addition, Herrera's attorney reported that at the time of Strange's murder, there was evidence indicating that Herrera and the defendant together were in possession of narcotics, the very reason Strange and Andujar were coming to visit the defendant on the day the shootings occurred. Testimony disclosing such information could have exposed Herrera not only to drug charges but also, potentially, to a charge of conspiracy to commit murder or of joint venture as a participant in the murder. Additionally, Herrera's trial testimony theoretically could have had implications for the several charges that were then pending against him in the District Court. See note 4, *supra*. See also *Commonwealth* v. *Farley*, 443 Mass. 740, 749, cert. denied, 546 U.S. 1035 (2005) (upholding finding of privilege in murder trial where testimony would tend to incriminate witness as drug dealer). The judge did not err in concluding Herrera had a valid Fifth Amendment privilege.

The defendant argues also that the judge erroneously excluded his counsel from the in camera hearing on Herrera's Fifth Amendment privilege. The argument fails. First, insofar as the hearing may be characterized as the first part of an immunity application process under G. L. c. 233, § 20E, rather than a privilege hearing pursuant to *Commonwealth* v. *Martin*, 423 Mass. 496, 504-505 (1996), exclusion of the defendant and defense counsel would be appropriate.

Second, even if the hearing is more appropriately character-ized as a so-called *Martin* hearing, its occurrence was not prejudicial to the defendant. It is apparent from the record that an in camera *Martin* hearing was not necessary in this case, because the information disclosed by Herrera's attorney in the court room, with defense counsel present, concerning the bases for Herrera's Fifth Amendment privilege claim was itself suf-ficient to support the witness's claim of privilege. See *Pixley,* 453 Mass. at 833, citing *Commonwealth* v. *Sanders,* 451 Mass. 290, 295-296 (2008) ("a *Martin* hearing should be conducted only as an exception to the general rule that the judge's verifica-tion of the validity of the privilege be based on information provided in open court"). Moreover, the defendant's appellate counsel received access to the transcript of the in camera hear-ing, contrary to our ruling in the *Pixley* case. See *Pixley,* 453 Mass. at 836-837 ("In adopting the *Martin* procedure, we envisioned that the transcript of the hearing would by necessity be sealed and reopened only by an appellate court on appellate review. . . . [F]urther disclosure of . . . testimony at the *Martin* hearing to defense counsel or the defendant is prohibited by art. 12 [of the Massachusetts Declaration of Rights] and the Fifth Amendment"). In any event, it is firmly established that a defend-ant has no right to attend a *Martin* hearing because "[t]he hear-ing is held for reasons totally independent of the proceeding against the defendant, and the privilege is that of the witness," not the defendant. *Commonwealth* v. *Clemente,* 452 Mass. 295, 318 (2008), cert. denied, 555 U.S. 1181 (2009), citing *Com-monwealth* v. *Simpson,* 370 Mass. 119, 121 (1976). In the cir-cumstances, the defendant's exclusion from the challenged hear-ing did not prejudice him.

2. *Unanimity of verdict.* The defendant next argues that the jury's guilty verdict on the offense of assault and battery by means of a dangerous weapon (assault and battery) was not unanimous and must therefore be reversed. The background is as follows. In announcing the jury's verdicts, the foreman stated that the jury found the defendant guilty of murder in the first degree on a theory of extreme atrocity or cruelty, not guilty of armed assault of Andujar with intent to murder, and guilty of assault and battery of Andujar. After the foreman announced

each verdict, the clerk asked the jury as a group whether they were in agreement with the foreman's reported verdict, and the jury answered in the affirmative on each occasion. The trial transcript reflects that when polled at the defense counsel's request, each juror individually announced findings of guilty as to the murder charge, not guilty as to the charge of armed assault with intent to murder, and guilty on the charge of assault and battery, except one juror appeared to have responded "not guilty" to the offense of assault and battery.

Although the juror's response of "not guilty" clearly appears in the transcript, the transcript reflects no other indication by the judge, the attorneys, the clerk, or the jury that there was any question or issue with respect to the jury's verdict on the assault and battery charge (or any other) either that day or during sentencing the following day. In these circumstances, it seems plausible that the presence of the response "not guilty" is the result of a typographical error, as any discrepancy in the verdict does not appear to have been "reasonably intelligible beyond the jury box" and thus may not have "qualif[ied] as a public disagreement." See *Commonwealth* v. *Dias*, 419 Mass. 698, 703 (1995) (unanimous verdict despite claim that juror whispered "no" during reading of verdict, where "the judge, the clerk, and defense counsel, among others, neither saw nor heard dissent from any juror").

Our difficulty discerning public disagreement from the record underscores the importance of raising this type of claim in the context of a motion for a new trial. Cf. *Commonwealth* v. *Sheehy*, 412 Mass. 235, 237 n.2 (1992) (where issue not raised in new trial motion, court "need not consider an argument which urges reversal of a trial court's ruling when that argument is raised for the first time on appeal"). In the context of a motion for a new trial, it would have been possible for the motion judge to hear from those present when the verdicts were taken — e.g., the attorneys, the court officers, and the court reporter — and to make findings on the issue based on that evidence and, in this case, on the judge's own observations and memory because he also had been the trial judge. Cf. *Commonwealth* v. *Williams*, 450 Mass. 879, 892 (2008) (preferred method for raising ineffective assistance of counsel claim is through motion for new

trial because "[a] motion for a new trial allows for the presentation of evidence"). The defendant's delay in raising the issue is dispositive of his claim in this appeal, especially because his counsel had been provided a copy of the transcript over five and one-half years before filing his motion for a new trial, and the defendant could have included this issue in that motion.

3. *Denial of motion for new trial.* The defendant asserts error in the denial of his motion for a new trial because he was denied the effective assistance of trial counsel. Where, as here, a defendant has been convicted of murder in the first degree, "we consider his claim of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for determining ineffectiveness of counsel." *Commonwealth* v. *Gonzalez,* 443 Mass. 799, 808 (2005), citing *Commonwealth* v. *Wright,* 411 Mass. 678, 682 (1992). Under this standard, "we . . . consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright, supra.* "Under this more favorable standard of review, we consider a defendant's claim even if the action by trial counsel does not constitute conduct 'falling measurably below that . . . of an ordinary fallible lawyer.' " *Commonwealth* v. *Gonzalez, supra* at 808 809, quoting *Commonwealth* v. *MacKenzie,* 413 Mass. 498, 517 (1992).

a. *Failure to challenge competency of witness or move to strike witness's testimony.* The defendant claims that trial counsel was ineffective because he did not challenge Andujar's competency to testify. "Any person of sufficient understanding, although a party, may testify in any proceeding, civil or criminal, in court . . . ." G. L. c. 233, § 20. To determine a witness's competency, courts focus on two questions: (1) whether the witness has the "capacity to 'observe, remember, and give expression to that which she ha[s] seen, heard, or experienced' "; and (2) "whether she has 'understanding sufficient to comprehend . . . the obligation and duty to tell the truth . . . .' " *Commonwealth* v. *Brusgulis,* 398 Mass. 325, 329 (1986), quoting *Commonwealth* v. *Tatisos,* 238 Mass. 322, 325 (1921). "The

determination of competency is peculiarly within the province of the judge," *Commonwealth* v. *Brusgulis, supra,* quoting *Commonwealth* v. *Widrick,* 392 Mass. 884, 888 (1984), and the judge's "determination will rarely be faulted on appellate review." *Commonwealth* v. *Whitehead,* 379 Mass. 640, 656 (1980), and cases cited. "The tendency, . . . except in quite clear cases of incompetency, is to let the witness testify and have the triers make any proper discount for the quality of her 'understanding.' " *Id.*

In his decision on the defendant's motion for a new trial, the judge reviewed Andujar's testimony and stated:

> "Andujar had already used three bags of heroin by 3:00 P.M. on May 15, 2002. According to her, three bags of heroin were enough to prevent her from being sick, and she needed to use a total of seven bags of heroin to actually get high. On the date of her testimony at trial, however, Andujar was able to offer detailed testimony regarding her memory and perception of the events of May 15. There was nothing to suggest that Andujar was not competent to testify at trial."

The judge's conclusion about Andujar's competency was well supported by the record. It was for the jury, not the judge, to assess her credibility.[6] See *Commonwealth* v. *Sires,* 370 Mass. 541, 546 (1976), *S.C.,* 405 Mass. 598 (1989) (upholding competency of alcoholic witness on medication for hallucinations and loss of memory). We agree with the judge's conclusion that "[trial counsel] was not ineffective in declining to challenge Andujar's competency to testify and not moving to strike her testimony."

---

[6]The defendant further argues that Andujar expressed doubt whether the defendant was the shooter when she rhetorically asked the prosecutor before trial, "What if I'm wrong?" "What if he didn't do it?" after learning that the defendant was crying and saying that he did not do the shooting. The defendant argues that this statement demonstrates Andujar's incompetency to testify and thus renders trial counsel ineffective in failing to move to strike Andujar's testimony. To the contrary, it appears that Andujar's statement merely reflects concern for the serious implications of her testimony rather than doubt over her capacity to have observed and to remember what happened on the afternoon of the shooting. Moreover, the defendant's trial counsel questioned Andujar about her statement of concern on cross-examination, so the jury were able to evaluate its significance in assessing her credibility as a witness.

b. *Failure to pursue motion to suppress identification.* The defendant also claims that counsel was ineffective in failing to move to suppress Andujar's identification of the defendant. Andujar first identified the defendant as the shooter at the police station on May 15, 2002, the night of the shooting. On that occasion, Andujar gave the police a statement describing the shooter, and the police showed her a photographic array containing nine photographs. Andujar first selected a photograph of the defendant and then a photograph of someone who looked similar to him. She said she was about seventy per cent sure that the first photograph depicted the shooter. There was evidence that some hours later, at 2 A.M. on May 16, the police visited Andujar at her home and showed her only two photographs,[7] one of which depicted the defendant.[8] At the 2 A.M. visit she knew that the individuals depicted in the photographs were suspects. During a third meeting with the police at 5 P.M. on May 16, Andujar gave another statement and announced that she was one hundred per cent sure that the first photograph she had chosen from the nine-photograph array the previous day had depicted the shooter. Andujar also said at that time that she initially did not tell the police that it was a photograph of the defendant because she was afraid. As previously noted, Andujar had known the defendant for about one year at the time of the shooting.

Defense counsel was not ineffective in failing to pursue a motion to suppress Andujar's identification because such a motion would not have been successful. "Eyewitness identification of a person whom the witness had never seen before the crime or other incident presents a substantial risk of misidentification and increases the chance of a conviction of an innocent defendant." *Commonwealth* v. *Jones*, 423 Mass. 99, 109 (1996). Accordingly, "[a] photographic identification procedure is constitutionally invalid if the procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of

[7]Although Andujar testified that she believed that the police presented two photographs to her at the 2 A.M. meeting, Detective Joseph Tanona, who conducted the meeting, testified that the officers did not show Andujar any photographs on that occasion.

[8]The defendant states in his brief that Andujar testified that the second photograph depicted Herrera. In fact, however, Andujar testified that she was not sure whether the second photograph depicted Herrera.

irreparable misidentification.' " *Commonwealth* v. *Holland*, 410 Mass. 248, 253 (1991), quoting *Commonwealth* v. *Thornley*, 406 Mass. 96, 98 (1989). As the judge pointed out in his decision, Andujar had first identified the defendant in a stack of nine photographs of similar-looking suspects, she eventually told police she was certain the defendant was the shooter, she consistently described the defendant's physical appearance to the police throughout the investigation, and, most importantly, at the time of the identification, she had known the defendant for one year. See *Commonwealth* v. *Jackson*, 419 Mass. 716, 727-730 (1995) (upholding denial of motion to suppress photographic identification where unnecessarily suggestive police conduct occurred only after victim selected defendant from permissible photographic array of eight men). In these circumstances, any suggestibility deriving from a two-photograph array, if it was presented, would not have warranted suppression of Andujar's identification.

c. *Failure to request additional voir dire of juror.* On the second day of trial, a court officer reported to the judge that a juror had stated that "a couple of" jurors were concerned that the juror in seat number twelve had "made up his mind." The judge promptly reported the matter to counsel, explaining that "[a]pparently there was some concern that [the juror] hasn't been taking notes, or something of that sort" and that the basis for the jurors' observations or comments was "not entirely clear" but "appear[ed] to be more demeanor than actual statements." The judge concluded that it would be inappropriate to "intrud[e] on [the] juror's thought process" by questioning him based solely on appearance or demeanor. With the consent of both counsel, the judge elected to reinstruct the jurors to keep an open mind and to remain objective, neutral, and indifferent until all of the evidence had closed and they had been instructed in the law. The judge also appointed a foreperson at that time to ensure the jury complied with his instructions not to discuss the case with each other. There is no indication in the record that any issue was raised about the juror in seat number twelve or any other juror during the remainder of the trial.[9]

The defendant contends that his trial counsel was ineffective

---

[9]The juror in seat number twelve was a deliberating juror.

in failing to ask the judge to question juror number twelve or the juror who reported the potential problem to ensure that the reported juror was impartial. In his decision on the defendant's motion for a new trial, the judge concluded: "There was no serious question of possible prejudice, and this was simply a case of mere speculation by some of the jurors about another juror's thought process," and trial counsel thus "was not ineffective in agreeing to remedy the situation through an appropriate and forceful instruction to the jury." We agree.

"The constitutional standard of fairness requires only that the jurors be impartial and indifferent." *Commonwealth* v. *Daughtry*, 417 Mass. 136, 147 (1994), quoting *Commonwealth* v. *Jackson*, 376 Mass. 790, 799 (1978). The judge has considerable discretion in determining whether a juror has met that standard. See *Commonwealth* v. *Ferguson*, 425 Mass. 349, 352-353 (1997), quoting *Patton* v. *Yount*, 467 U.S. 1025, 1038 (1984) ("The determination of a juror's impartiality 'is essentially one of credibility, and therefore largely one of demeanor' . . . . In such circumstances, we give a trial judge's determination of impartiality great deference"). The record reflects that the judge carefully weighed the countervailing dangers of intrusion on the juror's thought process and juror partiality. The judge's decision to deal with the issue by giving a pointed instruction about the need to keep an open mind throughout the trial and by appointing the foreperson early in the trial to help monitor the jurors reflects a sound exercise of discretion.[10] See *Commonwealth* v. *Mendes*, 441 Mass. 459, 476-478 (2004), quoting *Commonwealth* v. *Francis*, 432 Mass. 353, 369 (2000) (no abuse of discretion by judge in refusing to conduct voir dire where concern based on "nothing more than speculation by one juror about another juror's thought process" that "did not amount to a 'serious question of possible prejudice' "). Counsel was not ineffective in agreeing with the judge's approach.

d. *Failure to move to strike testimony of paramedic.* The defendant also asserts that trial counsel should have moved to

---

[10]Although the judge appropriately might have questioned the reporting juror to understand better the basis of the concern expressed about juror number twelve, it was not an abuse of discretion for the judge to proceed as he did.

strike the testimony of Joan Cannon, one of the two paramedics who treated Andujar after the shootings. He argues that Cannon unexpectedly testified to Andujar's sobriety by stating that she "scored a 15 out of [15 on] the Glascow coma scale, which is a standard measurement . . . use[d] to ascertain people's mental status."

Contrary to the defendant's assertion, trial counsel did move to strike Cannon's initial testimony describing Andujar's score on the Glascow coma scale, and thereafter he objected to the prosecutor's question eliciting the scale's criteria. The judge denied the motion to strike and overruled the objection. Trial counsel further argued at sidebar that Cannon should not be allowed to give an expert opinion whether Andujar was under the influence of alcohol or narcotics, but the judge disagreed.[11] Furthermore, trial counsel effectively cross-examined Cannon, eliciting from her an admission that she had not noticed the track marks on Andujar's arms indicating drug use and that a person who had used heroin could not score a fifteen out of fifteen on the scale "because of the powerful effects of drugs on the body" and because a person under the influence of heroin is "[g]enerally . . . impaired in some fashion." Testimony of the defense witness Deanne Denison, another paramedic who interacted with Andujar at the crime scene, further called Cannon's testimony into question by describing Andujar as calm, with a flat or blunt affect — a presentation that can be consistent with heroin use — in contrast to Cannon's testimony that Andujar appeared distraught and agitated.

In sum, the trial record makes clear that counsel was not ineffective in handling Cannon as a witness. The defendant's argument lacks merit.

e. *Failure to call expert witnesses.* Finally, the defendant contends that his trial counsel was ineffective in failing to offer at trial the testimony of a defense pathologist, an expert on heroin addiction, and a defense chemist.

A claim of ineffective assistance of counsel for failure to call an expert witness is generally doomed where "[t]he defendant's claim is not supported by any affidavits" to disclose the content

---

[11]The defendant does not argue that these evidentiary rulings by the judge constitute an abuse of discretion or other legal error, and we discern no error.

of the omitted expert testimony. See *Commonwealth* v. *Morales*, 461 Mass. 765, 785 (2012), citing *Commonwealth* v. *Linton*, 456 Mass. 534, 555-556 (2010) (failure of defendant to produce affidavit of expert fatal to ineffective assistance of counsel claim). The defendant has not submitted any affidavits describing the testimony that a pathologist, a heroin addiction expert, or a chemist would have offered, and the trial record does not suggest that these types of experts could have assisted the defendant's case in any meaningful fashion. See *Commonwealth* v. *Sena*, 441 Mass. 822, 829-830 (2004) (no ineffective assistance for failure to call expert where expert "does not offer anything on that issue beyond what was already acknowledged by the Commonwealth's witnesses and conceded in the prosecutor's closing argument").

The defendant takes the position that a heroin addiction expert was necessary, first to demonstrate that the Glascow coma scale to which Cannon testified was irrelevant and inappropriate to the task of discerning level of drug use, and second to challenge Andujar's ability to describe the sequence of shots because of her drug use on that day. However, as just discussed, the transcript reflects that trial counsel went far in effectively discrediting Cannon's testimony regarding the Glascow coma scale on cross-examination. Moreover, Cannon testified that in addition to the Glascow coma scale, she performed a separate examination designed to identify whether Andujar was under the influence of narcotics. According to Cannon, Andujar's performance on the examination indicated she was not so influenced, a result consistent with Andujar's testimony that she needed to consume seven bags of heroin to "get high," but that she had only consumed three on the day of the killing. In addition, the other paramedic testified extensively about the symptoms of heroin use. As a practical matter, the jury were provided with essentially expert testimony on the subjects on which the defendant claims he needed expert opinion.

The defendant's claim that a chemist should have been called to testify regarding the absence of gunshot residue on the defendant's clothing is similarly unavailing. The record reflects that trial counsel ably cross-examined two expert witnesses presented by the Commonwealth about gunshot residue and elicited from

those witnesses detailed testimony about the lack of gunshot residue on the defendant's clothing and the general significance of the absence of gunshot residue from an individual's clothing.[12] Additionally, the trial record reflects that the defendant may have changed his clothing prior to his arrest. It is therefore not at all clear that any defense chemist would have been able to testify to an opinion that the absence of residue on the defendant's clothing made it reasonable to conclude that he was not the shooter.

Finally, the defendant claims that a pathologist would have undermined the Commonwealth's theory of murder by extreme atrocity or cruelty by establishing that the first shot hit Strange in the head and killed him instantaneously. This claim fails in the absence of an affidavit to such effect. The medical examiner testified that she could not opine on the order in which Strange received the four gunshot wounds, which may well mean that making such a determination of order is outside the scope of a pathologist's expertise. Without an affidavit from a pathologist reflecting a contrary opinion, we cannot evaluate the defendant's ineffective assistance argument based on trial counsel's failure to call a pathologist.

4. *Sufficiency of evidence on extreme atrocity or cruelty.* At the close of the Commonwealth's case, the trial judge denied the defendant's motion for a required finding of not guilty as to all charges. On appeal, the defendant contends that the denial was error because the evidence was insufficient to convict him of murder in the first degree on the theory of extreme atrocity or cruelty. "In reviewing a denial of a motion for a required finding of not guilty, we ask whether, viewing the evidence in the light most favorable to the Commonwealth, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' " (emphasis in original). *Commonwealth* v. *Perez*, 460 Mass. 683, 702 (2011), quoting *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). "In reviewing the sufficiency of the evidence, we keep in mind that the evidence relied on to establish a defendant's guilt may be

---

[12]For example, the witnesses' testimony implied that the absence of residue could mean that the person did not fire a gun, or that enough time had passed before residue testing for the residue to disappear.

entirely circumstantial . . . and that the inferences a jury may draw from the evidence 'need only be reasonable and possible and need not be necessary or inescapable.' " *Commonwealth* v. *Linton*, 456 Mass. at 544, quoting *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005), *S.C.*, 450 Mass. 215 (2007), and *S.C.*, 460 Mass. 12 (2011).

The factors a jury may use to support a finding of extreme atrocity or cruelty are set forth in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983) (*Cunneen*):

> "[F]actors which a jury can consider in deciding whether a murder was committed with extreme atrocity or cruelty . . . include [1] indifference to or taking pleasure in the victim's suffering, [2] consciousness and degree of suffering of the victim, [3] extent of physical injuries, [4] number of blows, [5] manner and force with which delivered, [6] instrument employed, and [7] disproportion between the means needed to cause death and those employed."

The jury need only find one of these factors to establish the element of extreme atrocity or cruelty. *Commonwealth* v. *Young*, 461 Mass. 198, 204 (2012). The Commonwealth presented evidence that the defendant fired as many as five shots at Strange as Strange ascended the stairs and turned to flee, inflicting multiple gunshot wounds including a fatal wound to Strange's head. The Commonwealth also presented evidence that the defendant smiled and then frowned immediately after Strange fell. The jury could have found from this evidence that at least one or, more realistically, most of the *Cunneen* factors characterized the defendant's killing of Strange. See, e.g., *Commonwealth* v. *Moses*, 436 Mass. 598, 601 (2002) (sufficient evidence of extreme atrocity or cruelty where defendant shot victim four times); *Commonwealth* v. *Little*, 431 Mass. 782, 783, 785 (2000) (sufficient evidence of extreme atrocity or cruelty where defendant fired seven shots at victim with handgun).

The defendant argues that the evidence supports a finding that the first shot fired hit Strange in the head and that he died instantaneously as a result of that shot, thus foreclosing a finding of extreme atrocity or cruelty. The record does not support this view of the facts. While there were some discrepancies in Andujar's testimony on direct and cross-examination about the

precise sequence of events during the shooting incident, she was consistent throughout in stating that Strange fell only after multiple shots had been fired. The pathologist in fact testified only that the shot to Strange's head was fatal and did not testify about how quickly such a wound would cause death or when in the sequence of gunshot wounds the shot to Strange's head occurred. Thus, if the shot to Strange's head killed him instantaneously, as the defendant argues, then the shot to his head must have been the final shot that prompted his fall.[13]

In any event, "even if the victim died instantaneously from the [first] blow, that would affect only the first two *Cunneen* factors, not the remaining five." *Commonwealth* v. *Whitaker*, 460 Mass. 409, 417 (2011). When viewed in the light most favorable to the Commonwealth, the evidence made it both possible and reasonable for the jury to find the defendant guilty of murder in the first degree on the theory of extreme atrocity or cruelty.

5. *G. L. c. 278, § 33E.* We have examined thoroughly the record in this case pursuant to our duty under G. L. c. 278, § 33E. We find no basis on which to grant the defendant relief.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*

---

[13]To the extent that the defendant has argued that the shot to the head must have been first because the bullet entered the front of his skull and angled down, suggesting that Strange at the time was facing up the stairway toward the shooter, Andujar's testimony offers an alternative explanation: "[Strange did] not turn around and jump down the steps, he jumped backwards." The shot to Strange's head therefore was not necessarily the first shot inflicted.